## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

ELIZABETH CAPARELLI-RUFF,

      Plaintiff,

      v.

BOARD OF EDUCATION OF EAST
AURORA SCHOOL DISTRICT 131 and
KIMBERLY KERELUIK,

      Defendants.

Case No. 1:22-cv-05567

Judge John Robert Blakey

## <u>MEMORANDUM OPINION AND ORDER</u>

In the spring of 2022, Plaintiff Elizabeth Caparelli-Ruff, who worked for the Board of Education of East Aurora School District 131, launched a campaign for Regional Superintendent of Schools in Will County. To raise money for her campaign, she advertised a gun raffle on Facebook. The grand prize? One Beretta 9mm Luger. According to the Complaint, the Board learned of the Facebook post and fired Plaintiff without notice, just days after renewing her contract. *See* [12] ¶ 20.

Plaintiff now sues the Board, asserting claims for breach of contract, retaliatory discharge, and intentional infliction of emotional distress. She also sues one of the Board's employees, Kimberly Kereluik, alleging tortious interference with contract and tortious interference with prospective economic advantage. *Id*. Defendants jointly move to dismiss all claims, [15]. For the reasons described herein, the Court grants in part, and denies in part, Defendants' motion.

I.  **Factual Allegations¹**

During the 2021–22 school year, Plaintiff served as Executive Director of Middle and Secondary School Services in the East Aurora school system.  [12] ¶ 4.  Pursuant to a contract between the parties, Plaintiff's employment began July 1, 2021 and was slated to continue through June 30, 2022 ("2021 Contract").  *Id.* ¶ 5; [12-2].  According to the Complaint, Plaintiff discharged her duties admirably throughout the school year, as evidenced by the positive performance reviews, compliments, and accolades she received.  *See* [12] ¶¶ 6–8.

In the spring of 2022, Plaintiff decided to run for office, launching a campaign to become Regional Superintendent of Schools for Will County.  *Id.* ¶ 9.  As part of this effort, Plaintiff launched a private Facebook page, where she posted about her campaign and about education issues in the community.  *Id.* ¶ 11–13.

To raise money for her campaign, Plaintiff posted about a gun raffle.  *Id.* ¶ 15.  The "Grand Prize" advertised to raffle participants was a Beretta 9mm Luger.  *Id.*; [12-3].

The Board of Education offered Plaintiff an opportunity to renew her contract on June 1, 2022.  [12] ¶ 16.  Plaintiff accepted the offer, signing and delivering the renewal contract, which by its terms would have run from July 1, 2022 through June 30, 2023 ("2022 Contract").  *Id.* ¶¶ 16–17.  Pursuant to the 2022 Contract, Plaintiff

---

¹ For purposes of deciding the motion to dismiss, the Court takes as true the allegations presented in Plaintiff's amended complaint, [12].

was to receive an annual pay raise of $21,000. *Id.* ¶ 18. Otherwise, the terms of the 2022 Contract were "substantially the same" as those of the 2021 contract. *Id.*[2]

Shortly thereafter, on or about June 7, 2022, the Board of Education informed Plaintiff that she was "immediately placed on administrative leave and was terminated." *Id.* ¶ 20. The only reason provided was that the Board of Education "did not approve of the posting on the Plaintiff's Facebook page advertising the gun raffle." *Id.* ¶ 20. Plaintiff received no prior notice of the termination nor any opportunity to be heard. *Id.* ¶ 24.

Plaintiff sued, and Defendants now move to dismiss her claims under Rule 12(b)(6) for failure to state a claim.

## II.    Standard of Review

To survive a motion to dismiss under Rule 12(b)(6), a complaint must provide a "short and plain statement of the claim" showing that the pleader merits relief, Fed. R. Civ. P. 8(a)(2), so the defendant has "fair notice" of the claim "and the grounds upon which it rests," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A complaint must also contain "sufficient factual matter" to state a facially plausible claim to relief—one that "allows the court to draw the reasonable inference" that the defendant committed the alleged misconduct. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). The Court accepts well-pleaded facts in the complaint as true for purposes of a motion to dismiss, but legal conclusions and conclusory allegations "are not

---

[2] The Amended Complaint asserts that Defendants retained the only copy of the 2022 Contract. [12] ¶ 19.

entitled to this presumption of truth." *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (citing *Iqbal*, 556 U.S. at 681).

## III. Analysis

Defendants move to dismiss all counts, [15], and the Court considers the parties' arguments as to each count in turn.

### A. Breach of Contract (Counts One and Two)

Counts One and Two of the Complaint allege that the Board violated the 2021 Contract and 2022 Contract, respectively, by wrongfully terminating the contracts without cause, appropriate notice, or the process required by the District's policies and procedures. [12] ¶¶ 22–29.

To state a claim for breach of contract under Illinois law, Plaintiff must plausibly allege: (1) the existence of a valid and enforceable contract; (2) substantial performance by the plaintiff; (3) breach by the defendant; and (4) damages caused by that breach. *See Babbitt Municipalities, Inc. v. Health Care Service Corp.*, 64 N.E.3d 1178 (Ill. 2016).

### 1. Breach of 2021 Contract

The Board of Education asks the Court to dismiss Count One (breach of the 2021 Contract) for one reason only: that Plaintiff has not pled any damages resulting from premature termination of the contract. [17] at 10.

Count One contains the following allegation:

As a result of Board of Education's breach of the 2021 Contract and wrongful termination of Plaintiff's employment, Plaintiff has suffered monetary damages, including, but not limited to, back pay, front pay, continued participation in the Teacher's Retirement System, and such

other benefits *as were provided in the renewal contract* signed by the Plaintiff and delivered to the Defendant.

[12] ¶ 25 (emphasis added).

According to Defendants, Plaintiff alleges damages pertaining to the wrong contract. By referencing the "renewal contract" (i.e. the 2022 Contract) instead of the 2021 Contract, Defendants allege that Plaintiffs failed to plead any damages caused by the alleged breach of the 2021 Contract. [17] at 10.

Plaintiff responds simply that the Amended Complaint is sufficient to put the Board on notice of the fact that she suffered monetary damages from the breach of the 2021 Contract. [21] at 10.

The Court agrees. On a motion to dismiss, the Court construes the Complaint in the light most favorable to the plaintiff. *Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008). Doing so here, the Court finds that the language "as were provided in the renewal contract" explains the term immediately preceding it: "other such benefits," and need not be read to limit the other categories of damages. While perhaps Plaintiff intended to write "as provided in the 2021 Contract," instead of "as provided in the renewal contract," in Count One, the damages allegations as written clearly convey that Plaintiff suffered monetary damages from Defendants' alleged breach of the 2021 Contract at least in the forms of back pay, front pay, and continued participation in the retirement program. These allegations sufficiently plead the damages element of Plaintiff's breach of contract claim and provide Defendant notice of the injury Plaintiff alleges. The Court denies Defendants' motion to dismiss Count One.

### 2.    Breach of 2022 Contract

The Board also asks the Court to dismiss Count Two, arguing that Plaintiff fails to sufficiently plead the terms and conditions of the purported 2022 Contract. [17] at 11.

Plaintiff attached the 2021 Contract as an exhibit to the Amended Complaint, [12-2], but explains that Defendants retained the only copy of the 2022 Contract, *id.* at 19, and thus Plaintiff could not attach it as an exhibit. The Complaint alleges that the 2022 Contract contained "substantially the same" terms as the 2021 Contract. [12] ¶ 18. The only difference the Complaint notes is that the latter contract provided for an annual pay raise of $21,000. *Id.*

Plaintiff is not required to attach the document itself in order to state a claim. *See Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.3d 429, 431 (7th Cir. 1993) ("A plaintiff is under no obligation to attach to her complaint documents upon which her action is based, but a defendant may introduce certain pertinent documents if the plaintiff fails to do so."). Instead, Plaintiff must simply plead the material terms. Read in the light most favorable to Plaintiff, the allegations indicate that the 2022 Contract, just like the 2021 Contract, required notice of termination and due process in accordance with District policies, and permitted dismissal only "for cause." [12] at 27. These terms, bolstered by the Complaint's incorporation of the attached 2021 Contract by reference, sufficiently set forth a viable breach of contract claim. Thus, the Court also denies Defendants' motion to dismiss Count Two.

### B.  First Amendment Retaliation (Count Three)

Section 1983 creates a private right of action against any person who, under color of state law, "subjects, or causes to be subjected" any person within the United States "to the deprivation of any rights, privileges, or immunities" secured by federal law.  18 U.S.C. § 1983.  In Count Three, Plaintiff alleges that the Board of Education violated § 1983 by firing her in retaliation for First Amendment protected speech. [12] ¶¶ 30–36.

To prove a First Amendment retaliation claim, a public employee "must establish three elements: first, that she engaged in constitutionally protected speech; second, that she suffered a deprivation likely to deter protected speech; and third, that her protected speech was a motivating factor in the deprivation and ultimately, if the public employer cannot show it would have inflicted the deprivation anyway, its but-for cause." *Harnishfeger v. United States*, 943 F.3d 1105, 1112–13 (7th Cir. 2019).

Defendants move to dismiss Count Three on several grounds, arguing that: the Complaint has not adequately alleged municipal liability; Plaintiff's speech was not protected by the First Amendment; and, even if Plaintiff's speech was protected, her First Amendment rights were outweighed by the District's interests.  For the reasons discussed herein, none of Defendants' arguments merits dismissal.

### 1.  Municipal Liability

Defendant argues that Plaintiff has not properly pled municipal liability pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978).  There, the Supreme

7

Court held that municipalities are "persons" who could be sued under § 1983. *Id.* at 690. Such liability, however, extends only to violations attributable to a municipality itself and does not create vicarious liability for the unlawful acts of employees. *Id.* at 691.

According to the Complaint, the Board explicitly terminated Plaintiff because it "did not approve of the posting on the Plaintiff's Facebook page advertising the gun raffle." [12] ¶ 20. The unlawful action of the Board itself is thus at issue; Plaintiff does not seek to hold the Board vicariously liable for the actions of a subordinate.

Case law interpreting *Monell* sets forth three alternative ways of showing municipal responsibility: Plaintiff must "produce evidence of '(1) an express policy that, when enforced, causes a constitutional deprivation; (2) a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law; or (3) an allegation that the constitutional injury was caused by a person with final policymaking authority.'" *Phelan v. Cook County*, 463 F.3d 773, 789 (7th Cir. 2006) (internal quotations and citations omitted). Plaintiff identifies the Board as a "final policymaker" and seeks to proceed under the third path. *See* [12] ¶ 31.

Whether a person or entity is a final policymaker with regard to a particular subject remains a question of state law. *Darchak v. City of Chicago Bd. of Educ.*, 580 F.3d 622, 629 (7th Cir. 2009) (citing *McMillian v. Monroe County, Ala.*, 520 U.S. 781, 786 (1997)). In Illinois, school boards are the ultimate authority over personnel

matters such as hiring and firing.  105 Ill. Comp. Stat. 5/34-8.1 ("The right to employ, discharge, and layoff shall be vested solely with the board...").

Defendants argue that Plaintiff cannot hold the Board liable because she has not alleged a municipal *policy* of First Amendment retaliation.  They suggest that Plaintiff's termination, as an isolated incident, remains insufficient to subject the Board to liability under § 1983.  [23] at 4–5.  The legal question to be resolved, then, is whether *Monell* liability is proper where a final policymaker makes a single unlawful decision or alternatively, whether liability attaches only when the policymaker, in making the decision, sets precedent for the future.

The Seventh Circuit has recognized the understandable confusion over *Monell*'s use of the term "policy."  In *Gernetzke v. Kenosha Unified Sch. Dist. No. 1*, 274 F.3d 464, 468 (7th Cir. 2001), the court explained that, although  "courts often refer to the municipality's final decision-making authority as its 'final policymaking authority," these phrases "are potentially misleading."  *Id.*  It does not matter "what *form* the action of the responsible authority that injures the plaintiff takes."  *Id.*  Indeed, it "might be an ordinance, a regulation, an executive policy, or an executive act (such as firing the plaintiff)."  *Id.*  Regardless of form, the "question is whether the promulgator, or the actor, as the case may be—in other words, the decisionmaker—was at the apex of authority for the action in question."  *Id.*

*Gernetzke* explicitly identifies "an executive act" such as "firing the plaintiff" as a potential basis for liability.  *See also Sweet v. Town of Bargersville*, 18 F.4th 273, 277 n. 2 (7th Cir. 2021) (permitting *Monell* claim for First Amendment retaliation to

9

go forward where parties did not dispute the actor's status as a final policymaker). And *Gernetzke*'s reading of *Monell* remains consistent with the Supreme Court's post-*Monell* jurisprudence.

In *Pembaur v. City of Cincinnati*, a plurality of the Supreme Court explained that *Monell*'s "official policy" requirement "was intended to distinguish acts of the *municipality* from acts of *employees* of the municipality, and thereby make clear that municipal liability is limited to action for which the municipality is actually responsible." 475 U.S. 469, 479–80 (1986). The Supreme Court then held that "it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances," whether or not "that body had taken similar action in the past or intended to do so in the future—because even a single decision by such a body unquestionably constitutes an act of official government policy." *Id.* The Court cited, for example, *Owen v. City of Independence*, 445 U.S. 622 (1980), wherein a city council passed a resolution firing the plaintiff without a pretermination hearing. "Policy," as used in *Monell*, includes both "fixed plans of action to be followed under similar circumstances consistently and over time," as well as a course of action "tailored to a particular situation and not intended to control decisions in later situations." *Id.* The Supreme Court unequivocally held that "where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." *Id.*

Two years after *Pembaur*, in *St. Louis v. Praprotnik*, the Supreme Court found that the defendants were not final decisionmakers, and thus the Court explored the more nuanced questions of whether they had acted pursuant to municipal policy, had been delegated final policymaking authority, or whether their acts—and the rationales for them—had been ratified by a final policymaker. Many of the cases Defendants cite here deal with these adjacent questions. *See, e.g. Auriemma v. Rice,* 957 F.2d 397, 401 (7th Cir. 1992) (addressing the question of when an individual is considered a final policymaker); *Kelly v. Gersonde*, No. 19-CV-01118-BHL, 2021 WL 2895735, at *5 (E.D. Wis. July 8, 2021) (rejecting respondeat superior claim pursuant to *Monell*); *McCormick v. City of Chicago*, 230 F.3d 319, 324 (7th Cir. 2000) (finding allegations sufficient to show a widespread policy or practice); *McCauley v. City of Chicago*, 671 F.3d 611, 616 (7th Cir. 2011) (evaluating allegations regarding municipal policies and customs, not final policymaker liability). But Plaintiff here has sued the Board, which the parties agree is the final policymaker for purposes of hiring and firing district employees, based upon *the Board's decision* to fire her. Defendants' citations thus remain inapposite.[3] Plaintiff may proceed.

---

[3] Defendants cite only one case which appears to stand for the proposition Defendants advance—that even the acts of final policymakers, acting in the scope of the area for which they have final policymaking authority, must be taken pursuant to an ongoing, precedential policy. That case is *Davis v. Metro. Pier & Exposition Auth.*, No. 11-cv-9018, 2012 WL 2576356 at *12 (N.D. Ill. July 3, 2012). The court there described the third path as "an act by an official with final policymaking authority where that act is in conformity with, or in the creation of, governmental policy or rules that essentially have the force of law." *Id.* at *11. This Court finds *Davis*'s formulation of the rule unpersuasive in light of *Pembaur* and *Gernetzke*.

### 2.    Protected Speech

Defendants also argue that, even if the municipality is liable, Plaintiff cannot state a claim because her Facebook post did not constitute First Amendment protected activity.

For a public employee's speech to be protected under the First Amendment, the employee must show that: (1) she made the speech as a private citizen; (2) the speech addressed a matter of public concern; and (3) her interests under the First Amendment were not outweighed by the state's interests as an employer in 'promoting effective and efficient public service.'" *Swetlik v. Crawford*, 738 F.3d 818, 825 (7th Cir. 2013) (quoting *Houskins v. Sheahan*, 549 F.3d 480, 490 (7th Cir. 2008)).

The parties do not dispute that, in posting to Facebook, Plaintiff was speaking as a citizen rather than in her capacity as an employee. Thus, the Court turns to the question of whether Plaintiff's speech addressed a matter of public concern. If Plaintiff can cross this legal threshold, *Pickering v. Board of Educ. of Township High Sch. Dist. 205* requires the Court to balance the interests of the plaintiff, "as a citizen, commenting on matters of public concern," against the interests of the municipality, "as an employer, in promoting the efficiency of the public services it performs through its employees." 391 U.S. 563, 568 (1968).

As the Seventh Circuit explained in *Harnishfeger v. United States*, "there are at least two routes to *Pickering* balancing." 943 F.3d at 1113. The first requires the employee to establish that she spoke as a citizen rather than as an employee, *see Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006), and that she spoke on a matter of public

12

concern rather than "matters only of personal interest," *see Connick v. Myers*, 461 U.S. 138, 147 (1983). When an employee's speech "is neither at work nor about work, however, a different path to *Pickering* is available." *Harnishfeger*, 943 F.3d at 1113. Under *United States v. National Treasury Employees Union*, speech made "outside the workplace," which involves "content largely unrelated" to government employment, and which "is addressed to a public audience," or involves "any matter for which there is potentially a public," crosses the initial "matter of public concern" threshold and *Pickering* balancing applies. *Harnishfeger*, 943 F.3d at 1113 (quoting *United States v. National Treasury Employees Union*, 513 U.S. 454, 466 (1995) (hereinafter *NTEU*)). But if an employer can show that the employee took "deliberate steps" to link the speech to the employer's mission, purpose, or image, then *Connick*, not *NTEU*, controls. *Id.*

In briefing, Plaintiff argues that her speech (as part of a campaign in another county) was utterly unrelated to her employment with the Board, *see* [21] ¶¶ 14–15. The facts in the Complaint do not conclusively determine that this is the case. Thus, at this early stage, the Court cannot yet determine which test applies.[4]

Under *NTEU*, the question is merely whether Plaintiff's speech is "addressed to a public audience." *Harnishfeger*, 943 F.3d at 1113. Given Plaintiff's allegations that the Facebook post served as a campaign advertisement, her speech meets this threshold.

---

[4] Both parties fail to recognize the potential applicability of *NTEU*. Defendants argue under *Connick*, and Plaintiff ostensibly abandons the public employee context entirely and cites an Illinois case setting forth the standard for a private citizen–not a public employee–to state a First Amendment retaliation claim. *See* [21] ¶ 15 (citing *Dempsey v. Johnson*, 69 N.E.3d 236 (Ill. App. Ct. 2016)).

Alternatively, to determine whether speech can fairly be characterized as touching upon a matter of public concern under *Connick*, the Court must evaluate the "content, form, and context of a given statement, as revealed by the whole record," and resolve whether the speech is related "to any matter of political, social, or other concern to the community." *Connick*, 461 U.S. at 146, 147–48.

According to Defendants, Plaintiff's "social media post was not a matter of public concern protected by the First Amendment," and was instead, "about raising money for her own concerns," "related to her personal campaign to find another job." [17] at 7. In some sense, perhaps, every politician's run for elected office constitutes a "campaign to find another job." But a speaker's private interest does not preclude the possibility that the speech *also* touches upon a matter of public concern—Defendants' argument would have merit only if they could show Plaintiff's speech was *purely* a private matter. *See Harnishfeger*, 943 F.3d at 1113. Here, the Complaint alleges that the Facebook post served as a fundraising effort for Plaintiff's political campaign for Regional Superintendent of Schools for Will County.[5] [12] ¶¶ 9, 12. Defendants have presented no basis to distinguish Plaintiff's speech from other campaign-related speech, which generally meets the "public concern" standard. *See, e.g. Coady v. Steil*, 187 F.3d 727, 731 (7th Cir. 1999) (finding that a sign stating

---

[5] Other allegations in the Complaint could be read to contradict this: Plaintiff repeats that the account is "private," *see, e.g.* [12] ¶ 11, calling into question whether the posts were in fact directed to a public audience. More fundamentally, the attached exhibit, *see* [12-3], appears on an account with no apparent connection to Plaintiff's own name, prompting the need for further context before the Court can conclusively find that the post constitutes Plaintiff's protected speech. Nonetheless, taking the Complaint's allegations as true and construing all inferences in Plaintiff's favor, the Court rules today that Plaintiff has plausibly *alleged* protected speech. Defendants remain free to re-raise the question on a more developed factual record.

14

"Curran for Mayor" atop a car "clearly fits the definition of 'a matter of public concern'"); *Jantzen v. Hawkins*, 188 F.3d 1247, 1257 (10th Cir. 1999) (holding that an employee's candidacy for political office "undoubtedly relates to matters of public concern"). *See also Monitor Patriot Co. v. Roy,* 401 U.S. 265, 272 (1971) (The First Amendment's "constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office.").

The Court thus finds, for purposes of the motion to dismiss, that whether *NTEU* or *Connick* ultimately controls, Plaintiff has plausibly alleged speech that comes under the First Amendment's protection.

Defendants also argue that, even if Plaintiff's speech did touch upon a matter of public concern, it remains unprotected by the First Amendment because, as a matter of law, Plaintiff's free speech interests are outweighed by the Board's interests in promoting "an efficient, disruption-free workplace." [17] at 8 (citing *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 284 (1977)). In other words, Defendants argue that Plaintiff's speech fails the *Pickering* balancing test. Again, Defendants' argument fails at this stage.

Defendants ask the Court to take judicial notice of the world events taking place at the time of Plaintiff's post—specifically, the massacre of 19 children in a school shooting in Uvalde, Texas, on May 24, 2022—and to find, as a matter of law, that Plaintiff's Facebook post "could hinder the efficiency in the School District's ability to provide an educational environment without disruption at a time of national

15

mourning." [17] at 9. On this basis, Defendants suggest that "a disruption-free school environment outweighs any alleged constitutional right held by Plaintiff." *Id.*

At present, the Court must take Plaintiff's allegations as true and draw all inferences in Plaintiff's favor. And Defendants' argument, which attempts to draw an ill-defined connection between a lawful gun raffle hosted on social media, and obviously tragic and unlawful mass shootings at schools, remains predicated upon numerous, dubious inferences drawn in *Defendants' favor*—if not upon rank speculation. Defendants' argument on this point thus provides an insufficient basis for dismissal, and the Court defers further consideration of the *Pickering* balancing test until a later phase of this litigation, after the parties have developed the factual record. Plaintiff's claim may proceed.

## C. Intentional Infliction of Emotional Distress (Count Four)

Count Four alleges that the Board of Education's conduct in terminating Plaintiff's employment constituted intentional infliction of emotional distress ("IIED") in violation of Illinois common law. To prevail on an IIED claim, a plaintiff must establish the following: "(1) conduct involved must be truly extreme and outrageous, (2) actor must either intend that his conduct inflict severe emotional distress or know that there is at least a high probability that his conduct will cause severe emotional distress, and (3) conduct must in fact cause severe emotional distress." *Lewis v. Sch. Dist. #70*, 523 F.3d 730, 746 (7th Cir. 2008) (quoting *Honaker v. Smith*, 256 F.3d 477, 490 (7th Cir. 2001)). To meet the "extreme and outrageous" standard, Defendants' conduct "must extend the bounds of human decency and be

considered intolerable in a civilized community," when judged by an objective standard. *Honaker*, 256 F.3d at 490.

The Board of Education moves to dismiss this claim on the grounds that the conduct alleged—specifically, terminating Plaintiff's contract in response to her Facebook post about the gun raffle—does not meet the high bar for "extreme and outrageous" conduct required under Illinois law.

In assessing the extreme and outrageous nature of a defendant's alleged behavior, courts consider a number of factors, including "(1) the degree of power the defendant held over the plaintiff, especially where the alleged conduct includes a threat to use that power to the plaintiff's detriment; (2) whether the defendant reasonably believed that the objective of his or her conduct was legitimate; and (3) the defendant's knowledge that the plaintiff was particularly susceptible to emotional distress." *DiPietro v. GATX Corp.*, 167 N.E.3d 247 (Ill. App. Ct. 2020). This list of factors is not exhaustive, nor is any one or all of these factors necessary to a claim of intentional infliction of emotional distress. *Id.*

Illinois courts "have been hesitant to find intentional infliction of emotional distress in the workplace," where stressors frequently result from discipline, personality conflicts, job transfers, and indeed, terminations. *Naeem v. McKesson*, 444 F.3d 593, 605 (7th Cir. 2006). In the employer/employee context, the actions must "go well beyond the parameters of the typical workplace dispute." *Honaker*, 256 F.3d at 491. Illinois courts have found extreme and outrageous behavior in the workplace when the employer "clearly abuses the power it holds over an employee in a manner

17

far more severe than the typical disagreements or job-related stress caused by the average work environment." *Id.* For example, in *Graham v. Commonwealth Edison Co.*, the court found an employer's conduct extreme and outrageous where the employer pursued a months-long sham investigation into employee misconduct in retaliation for an employee's report of a safety violation. 742 N.E.2d 858, 868 (Ill. App. Ct. 2000). The alleged sham investigation involved months of interviews and repeated, provocative, defamatory statements made about the employee to a large audience. *Id.*

This case is not *Graham*. As alleged, the Board's conduct in terminating Plaintiff does not reach the level of intentional, outrageous conduct required to state a claim for IIED. *See DiPietro v. GATX Corp.*, 167 N.E.3d 247, 261 (Ill. App. Ct. 2020) ("To put it simply, the termination of an employee by an employer is not extreme and outrageous just because the employee disputes the merits of the termination and the employer holds power over the employee, since an employee will almost always deny that the termination was warranted and an employer always holds power over an employee.").

Moreover, as Defendants note, Plaintiff's allegations regarding the impact of her termination lack the factual detail required to render them plausible. While the Complaint states that Plaintiff "suffered severe emotional distress," conclusory allegations are not entitled to the same presumption of truth that well-pled facts merit at the motion to dismiss stage. *McCaulay*, 617 F.3d at 616. Plaintiff has not alleged the kind of impact required to show severe emotional distress. *See Mnyofu v.*

*Bd. of Educ. of Rich Twp. High Sch. Dist. 227*, 832 F. Supp. 2d 940, 950 (N.D. Ill. 2011) (conclusory allegations that plaintiff suffered severe emotional distress not sufficient to survive motion to dismiss); *Nardella v. Leyden High Sch. Dist. 212*, No. 15-CV-4885, 2017 WL 1806589, at *5 (N.D. Ill. May 5, 2017) (same); *McIntosh v. Kelly*, No. 16-CV-01018, 2017 WL 633810, at *7 (S.D. Ill. Feb. 16, 2017) (same).

The Court thus dismisses the claim as pled. But the dismissal is without prejudice: if in good faith and consistent with Rule 11, Plaintiff can allege additional facts sufficient to state an IIED claim, Plaintiff may replead this claim.

### D.    Tortious Interference Claims (Counts Five and Six)

In Count Five, Plaintiff sues Defendant Kereluik for tortious interference with contract, alleging that Kereluik made numerous false and misleading statements to Board members, including statements falsely suggesting that parents and staff had complained about Plaintiff's job performance. [12] ¶¶ 41–47.

In Count Six, Plaintiff sues Defendant Kereluik, in the alternative, for tortious interference with prospective economic advantage. *Id.* ¶¶ 48–54. In support of this claim, the Complaint restates the allegations that Kereluik made false statements about Plaintiff to members of the Board of Education. *Id.* ¶ 50.

Defendant Kereluik moves to dismiss both counts pursuant to the Illinois Tort Immunity Act. [17] at 13–15. The TIA provides, in pertinent part, that a "public employee acting in the scope of his employment is not liable for an injury caused by his negligent misrepresentation or in the provision of information either orally, in writing, by any other electronic transmission, or in a book form or other form of

19

library material." 745 Ill. Comp. Stat. 10/2-210. Defendant Kereluik invokes the "provision of information" category, which makes up "a separate category" from the immunity attaching to "negligent misrepresentation." *Goldberg v. Brooks*, 948 N.E.2d 1108, 1114 (Ill. App. Ct. 2011).

To establish immunity pursuant to the "provision of information" category, a defendant must show that she: (1) was a public employee; (2) who provided information; and (3) while acting within the scope of her employment. *Masters v. Murphy*, 176 N.E.3d 911, 916 (Ill. App. Ct. 2020). Nothing in the Complaint supports an inference that the statements exceeded the scope of Defendant's employment and Plaintiff makes no such argument in her response. Nor does Plaintiff argue that the statements do not constitute "provision of information."

Instead, Plaintiff argues that § 2-210 does not immunize "willful and wanton" conduct, which she alleges Defendant Kereluik engaged in here. In support, she invokes *Jane Doe-3 v. McLean County Unit District No. 5 Board of Directors*, 973 N.E.2d 880, 893 (Ill. 2012). There, a three-justice plurality of the Illinois Supreme Court considered whether § 2-210's "negligent misrepresentation" immunity covered "willful and wanton" conduct. By specifying that the misrepresentation at issue must be *negligent*, the plurality found, the legislature excluded willful and wanton conduct from the scope of the immunity conferred.

But as one justice writing separately noted, the plurality did not address the separate "provision of information" component—which Defendant Kereluik invokes here, and which does not contain the same "negligent" modifier. *See id.* at 903–04

20

(Garman, J., concurring in part and dissenting in part). This dynamic creates a question (as of yet unanswered by the Illinois Supreme Court) as to whether willful and wanton *provision of information* falls within the scope of the immunity § 2-210 confers.

This Court adopts of the reasoning of *Robertson v. Lofton* in resolving this question. No. 13-cv-3205, 2013 WL 5796780 (N.D. Ill. Oct. 25, 2013) (holding that § 2-210, although it precludes liability arising from "provision of information," does not bar claims for knowing defamatory statements in light of the express limitation of immunity to claims of *negligent* misrepresentation). *See also Logan v. City of Evanston*, No. 20-cv-1323, 2020 WL 6020487 at *23 (N.D. Ill. Oct. 12, 2020) (same). Drawing all inferences in favor of the Plaintiff for purposes of the motion to dismiss, Plaintiff has alleged that Kereluik injured her, not only by providing information, but also by making misrepresentations about her with deliberate, malicious intent. As the TIA protects only negligent misrepresentations, if Kereluik made false statements about Plaintiff in a willful and wanton manner, she would not enjoy immunity for those statements under the TIA. For this reason, the Court denies Defendants' motion to dismiss Counts Five and Six.

## IV. Damages

Defendants also argue, "as a threshold matter," that Plaintiff is not entitled to attorney's fees for supplemental state law claims. [17] at 4. The Court will address the matter of fees if and when the need arises.

**V.    Conclusion**

For the reasons set forth above, the Court grants in part, and denies in, part Defendants' motion to dismiss, [15].  The Court dismisses Count Four without prejudice but denies the motion as to the remaining counts.  If Plaintiff seeks to replead Count Four, she must do so by October 31, 2023.  If Plaintiff fails to amend, the case will proceed as to the remaining counts.

Dated:  September 27, 2023                    Entered:


                                              John Robert Blakey
                                              United States District Judge