**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ELIZABETH CAPARELLI-RUFF, | |
| Plaintiff, | |
| v. | Case No. 22 cv 5567 |
| BOARD OF EDUCATION OF EAST AURORA SCHOOL DISTRICT 131, | Honorable Sunil R. Harjani |
| Defendant. | |

## <u>MEMORANDUM OPINION AND ORDER</u>

In the spring of 2022, Elizabeth Caparelli-Ruff launched a campaign to run for Regional Superintendent of Schools in Will County. At the time, she was working for the East Aurora School District as the Executive Director of Student Services. After posting an advertisement on Facebook for a gun raffle fundraiser to support her campaign, she was placed on administrative leave by the Defendant District and informed that her contract would not be renewed for the 2022-2023 school year. Plaintiff filed suit against Defendant alleging it violated her First Amendment rights by retaliating against her for the advertisement, and that it breached both her 2021 and 2022 employment contracts. Before the Court is Defendant's motion for summary judgment on those claims. For the reasons stated below, Defendant's Motion for Summary Judgment, Doc. [55], is granted in part and denied in part. Plaintiff may proceed to trial on her First Amendment claim, but judgment is entered as a matter of law on the breach of contract claims for Defendant.

## Background

Plaintiff was the Executive Director of Student Services in the East Aurora School District for the 2021-2022 school year. Doc. [57] ¶ 1.  In this role, she was employed by Defendant under a one-year contract running from July 1, 2021, through June 30, 2022. *Id.* ¶ 5.  In the spring of 2022, Plaintiff launched a campaign for Regional Superintendent of Schools in Will County. *Id.* ¶¶ 40–41.  To raise money for her campaign, she held a gun raffle, which she promoted on Facebook in May 2022[1] with the following advertisement:



This lawsuit is about what Defendant did after discovering this advertisement, which is disputed.  According to Plaintiff, she was provided a renewal contract, which she signed and returned for the 2022-2023 school year on June 1, 2022, but was not allowed to make a copy. Doc. [59-2] ¶ 6.  Defendant asserts that no such contract ever existed, and argues that it never intended to give Plaintiff a renewal contract for the 2022 school year because of her poor performance. Doc. [56] at 9, 14–15; Doc. [62] ¶ 6.

---

[1] The date of when this advertisement was first posted to Facebook is not in the record. Doc. [57] ¶¶ 44–45; Doc. [12-3].

What is not disputed is that after Defendant discovered the advertisement, Plaintiff was placed on paid administrative leave on June 7, 2022, through the remainder of her 2021 contract. Doc. [57] ¶ 72; Doc. [59-2] ¶ 72. According to Plaintiff, she was terminated and had her 2022 contract withdrawn in violation of the First Amendment because of this advertisement. Doc. [59-1] at 2. Defendant disputes this and instead argues that she was not terminated but placed on paid leave, that she had no 2022 contract, and they had no obligation to offer her a renewal. Doc. [56] at 13–15. Further, Defendant states that she was placed on leave and not offered a renewal contract because of her poor performance, not because of any protected speech. *Id.* at 9–10.

## Legal Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The Court does not "weigh the evidence and determine the truth of the matter" but rather determines whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249. "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Id.* at 255.

## Discussion

Defendant contends that it should be granted summary judgment on all three counts. Starting with Plaintiff's First Amendment retaliation claim (Count III), Defendant argues that Plaintiff was not discussing a matter of public concern, and then even if she was, that the district's interests in efficiency and harmony outweigh her speech interests. Defendant further asserts that even if Plaintiff's speech was constitutionally protected, she did not suffer a deprivation likely to

deter protected speech and that the advertisement was not the motivating factor behind Defendant placing her on leave and not renewing her contract. As to Count I, Defendant argues that it was under no obligation to renew her contract for the 2022-2023 school year, that it performed under the contract, and that Plaintiff did not suffer any damages from being placed on administrative leave. Finally, as to Count II, Defendant asserts that a 2022 contract was never executed, so Plaintiff cannot establish a breach.

## I. Count III - First Amendment Retaliation Claim

Plaintiff claims that Defendant retaliated against her in violation of the First Amendment because of her campaign fundraiser advertisement. "To prove a First Amendment retaliation claim, a public employee must establish three elements: first, that she engaged in constitutionally protected speech; second, that she suffered a deprivation likely to deter protected speech; and third, that her protected speech was a motivating factor in the deprivation and ultimately, if the public employer cannot show it would have inflicted the deprivation anyway, its but-for cause." *Harnishfeger v. United States*, 943 F.3d 1105, 1112–13 (7th Cir. 2019) (citing *Graber v. Clarke*, 763 F.3d 888, 894–95 (7th Cir. 2014)).

As to the first element, whether a public employee engaged in constitutionally protected speech is a question of law, even though it may be predicated on factual determinations. *Id.* at 1113. This element requires a plaintiff to show they were acting as a private citizen (which is undisputed here) and that the speech involved a matter of public concern. *Craig v. Rich Twp. High Sch. Dist. 227*, 736 F.3d 1110, 1115 (7th Cir. 2013). And even if an employee establishes her private speech on a matter of public concern, to establish constitutionally protected speech an employee must then prevail "in the balance of employee and employer interests required by

4

*Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)."

*Harnishfeger*, 943 F.3d at 1113.

### a. Matter of Public Concern

Starting with the first element of a First Amendment claim, once it is established that a plaintiff spoke as a private citizen, rather than an employee, she must show that "she spoke on a matter of public concern rather than 'matters only of personal interest.'" *Harnishfeger*, 943 F.3d at 1113 (quoting *Connick v. Myers*, 461 U.S. 138, 147 (1983)).[2] "Despite its lofty terminology, the 'matter of public concern' inquiry does not require that speech relate to an issue of exceptional significance in order to be entitled to prima facie First Amendment protection." *Craig*, 736 F.3d at 1116. Instead, "public concern is something that is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." *City of San Diego v. Roe*, 543 U.S. 77, 83–84 (2004). The employee's speech "need not address a topic of great societal importance, or even pique the interest of a large segment of the public," rather "an employee who 'participates in a public dialogue on matters of interest to the public' will 'place his speech, prima facie, within the protection of the First Amendment.'" *Craig*, 736 F.3d at 1116 (quoting *Dishnow v. Sch. Dist. of Rib Lake*, 77 F.3d 194, 197 (7th Cir. 1996)) (cleaned up).

While the parties focus their arguments on whether this speech was in support of the Second Amendment, such an inquiry is unnecessary as the speech is undoubtedly political speech. "Political speech is clearly a matter of public concern[.]" *Zorzi v. Cnty. of Putnam*, 30 F.3d 885, 896 (7th Cir. 1994). There is no dispute that the advertisement at issue was part of Plaintiff's

---

[2] While a second path to *Pickering* balancing is available under *United States v. National Treasury Employees Union*, 513 U.S. 454 (1995) (*NTEU*), an employee must show that the employee's speech is made outside the workplace, involves content largely unrelated to her government employment, and is addressed to a public audience, or involves any matter for which there is potentially a public audience. *Harnishfeger*, 943 F.3d at 1113. Here, Plaintiff has not made any arguments or pointed to any evidence establishing that her conduct falls under *NTEU*. As such, the Court does not consider this alternate path.

campaign for Regional Superintendent of Schools in Will County. Thus, it was speech directed at the public that touched on the campaign for one of the candidates in the election.[3]

Taking the point further, this advertisement is unlike the types of speech found to be unprotected private speech. For example, in *Connick v. Myers*, an assistant district attorney was told she would be transferred sections, something she strongly opposed. 461 U.S. 138, 140 (1983). In response, she created and circulated a questionnaire to fifteen assistant district attorneys which asked about the office transfer policy, office morale, the need for a grievance committee, the level of confidence in supervisors, and whether employees felt pressured to work in political campaigns. *Id.* at 141. But the plaintiff's dispute with her transfer was a private matter about her employment conditions. So, the Supreme Court held that most of the questionnaire was not a matter of public concern, instead finding "questions pertaining to the confidence and trust that [plaintiff's] coworkers possess in various supervisors, the level of office morale, and the need for a grievance committee as mere extensions of [plaintiff's] dispute over her transfer to another section of the criminal court." *Id.* at 148. However, the one question related to employees feeling pressured to work on political campaigns was a matter of interest to the community, and a public employee must be able to speak on that issue without fear of retaliation. *Id.* at 149.

Here, Plaintiff's advertisement informed the public about a fundraiser held by a candidate for office. Information from and about a candidate for public office is a matter of interest to the community. *See Gazarkiewicz v. Town of Kingsford Heights, Indiana*, 359 F.3d 933, 942–43 (7th Cir. 2004) (finding a flyer about alleged misconduct by the city council, was a matter of public interest, regardless of the plaintiff's personal animus towards the defendants); *Coady v. Steil*, 187

---

[3] It is undisputed that when Plaintiff alleged in the complaint that the advertisement was on her "private" Facebook page, this was referring to Plaintiff's personal account page and not one sponsored by the East Aurora School District, and that the page was publicly accessible. Doc. [57] ¶ 42.

F.3d 727, 731 (7th Cir. 1999) (finding the "Curran for Mayor" sign was political speech and clearly fit within the definition of a matter of public concern). Defendant's attempt to distinguish fundraising for a political campaign from the political campaign itself is unpersuasive, as the very case Defendant relies on, *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 204–06 (2014), stands for the position that campaign contributions are protected by the First Amendment.

Further, although Defendant argues that Plaintiff's motive was personal, because she was trying to raise funds for her campaign, that "argument faces a high evidentiary burden as [the Seventh Circuit has] emphasized that speech of public importance is only transformed into a matter of private concern when it is motivated *solely* by the speaker's personal interests." *Gazarkiewicz*, 359 F.3d at 941–42 (emphasis in original). Plaintiff's advertisement on its face was about her political campaign and raising funds to run for political office. Such efforts, as part of a democratic election, are central to the protections offered by the First Amendment. So, to the extent Plaintiff had a personal interest in raising funds, it all related back to her political campaign, which is a matter of public interest.

### b. *Pickering* Balancing Test

Once a public employee has established that they spoke as a private citizen about a matter of public concern, the next "challenge in public-employee speech doctrine is 'to arrive at a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Harnishfeger*, 943 F.3d at 1115 (quoting *Pickering*, 391 U.S. at 568). The Seventh Circuit relies on seven factors when deciding whether the balance should be struck in favor of speech or efficiency:

> (1) whether the speech would create problems in maintaining discipline or harmony among co-workers; (2) whether the employment relationship is one in which

7

> personal loyalty and confidence are necessary; (3) whether the speech impeded the employee's ability to perform her responsibilities; (4) the time, place and manner of the speech; (5) the context in which the underlying dispute arose; (6) whether the matter was one on which debate was vital to informed decision making; and (7) whether the speaker should be regarded as a member of the general public.

*Harnishfeger*, 943 F.3d at 1115 (quoting *Kristofek v. Village of Orland Hills*, 832 F.3d 785, 796 (7th Cir. 2016)). Courts do not need to address each factor in every case. *Id.*

The public employer, here the Defendant, has the burden of showing by a preponderance of the evidence that this balance weighs in its favor. *Id.* (citing *Gustafson v. Jones*, 290 F.3d 895, 906, 909 (7th Cir. 2002)). Therefore, when moving for summary judgment on a *Pickering* balance defense, Defendant "must 'lay out the elements of the [defense], cite the facts which it believes satisf[y] these elements, and demonstrate why the record is so one-sided as to rule out the prospect of a finding in favor of the non-movant' on the defense." *Id.* at 1116 (quoting *Hotel 71 Mezz Lender LLC v. Nat'l Retirement Fund*, 778 F.3d 593, 601 (7th Cir. 2015)).

Before addressing the facts underlying this case, it is helpful to consider how courts have traditionally weighed these factors. In *Harnishfeger*, the plaintiff wrote a book under a pseudonym based on her experiences as a phone-sex operator. 943 F.3d at 1109–10. On June 2, 2016, on her private Facebook page, the plaintiff announced the publication of her book, in such a way that only her Facebook friends could see the post. On June 24, 2016, the plaintiff began her service with the Indiana Army National Guard where she was responsible for maintaining a database of information on service providers for veterans and their families. The plaintiff's supervisor sent a request to become her 'friend' on Facebook, which the plaintiff did not feel she could decline. Then in mid-to-late September 2016, her supervisor went through dozens, if not hundreds, of plaintiff's posts to find the one announcing the book publication. The post was then brought to the attention of the Indiana Army National Guard, who decided it did not present the guard in a favorable light, and removed plaintiff from her position.

8

The Seventh Circuit found that the *Pickering* balance did not weigh in the defendant employer's favor. *Id.* at 1115. As the Seventh Circuit explained, unlike rational basis review, "First Amendment rights cannot be trampled based on hypothetical concerns that a governmental employer never expressed." *Id.* at 1116 (quoting *Gustafson*, 290 F.3d at 910). Courts "must look instead to what the public employer's concerns 'really were.'" *Id.* at 1116 (quoting *Gustafson*, 290 F.3d at 909). The defendants asserted that the book and the plaintiff's Facebook post substantially diminished her effectiveness as an employee because they did not reflect a positive image of the organization and that it was in direct contradiction with the Guard's culture. However, the Seventh Circuit found there was no evidence in the record to support either the claim or a reasonable inference that the book would reflect poorly on the Guard. *Id.* at 1117. The Seventh Circuit also considered that the plaintiff's responsibilities were "so routine and clerical that she could not be viewed by a reasonable member of the public as speaking for the Guard on any matter[.]" *Id.* As such, the Seventh Circuit found there was "no evidence and no basis for believing that veterans or organizations serving them would distrust the Guard if the known author of a phone-sex memoir were permitted to collect and enter the organizations' contact information into a database on the Guard's behalf." *Id.* at 1118. The Seventh Circuit held that the fact that this was a private Facebook post, which her supervisor only found after digging through plaintiff's Facebook posts (after the plaintiff felt compelled to accept her friend request), weighed against the defendant. After considering this evidence, the Seventh Circuit determined that the reasons provided for the plaintiff's termination were pretext for its feelings about the content of the book, "[b]ut a public employer may not 'use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech.'" *Id.* at 1119 (quoting *Rankin*, 483 U.S. at 384).

Similarly, in, *McGreal v. Ostrov*, the Seventh Circuit reversed the grant of summary judgment for the defendants when there were disputed facts regarding whether the employer genuinely feared potential disruptions to the department's operation because of plaintiff's protected speech. 368 F.3d 657 (7th Cir. 2004). First, the Seventh Circuit considered the seven-month delay between the plaintiff's statements and the defendants' determination that the statements created a potential for disruption. The appellate court found that since there was no disruption in that time period, a reasonable jury could find that defendants' fear of disruption was pretextual. Further, the plaintiff, a police officer, presented evidence that his statements regarding possible crimes and corruption were true or arguably true, which his employer was aware of, and that it was part of his duties as an officer to bring them to light. *Id.* at 679. The Seventh Circuit held that this, combined with the department's lack of action against another officer accused of crimes, raised a genuine issue of fact on whether the department was concerned about an actual disruption or merely displeased with the content of the plaintiff's statements. *Id.* at 680.

These cases, where evidence of pretext was present, stand in stark contrast to cases where courts have granted summary judgment for an employer because the facts show a clear interest by the public employer under the *Pickering* balancing test. For example, in *Craig v. Rich Township High School District 227*, the plaintiff, a high school guidance counselor, wrote a book on adult relationship advice, titled "Its' Her Fault" that contained sexually provocative themes and used sexually explicit terminology, including that "women act based on emotion alone instead of emotion plus intellect[,]" a chapter "informing women of the effectiveness of using sex appeal to obtain power in a relationship[,]" and an "argument that women must submit to their male partners in order to prevent them from being unfaithful[.]" 736 F.3d 1110, 1114 (7th Cir. 2013). The school district fired the plaintiff because his book: (1) caused "disruption, concern, distrust and confusion

10

among members of the School District community;" (2) violated a school policy against creating "an intimidating, hostile, or offensive educational environment;" and (3) plaintiff "failed to present [himself as] a positive role model and failed to properly comport himself in accordance with his professional obligations as a public teacher." *Id.* at 1115. The Seventh Circuit found that while the book was a matter of public concern, the school district's interest in maintaining effective functioning outweighed the plaintiff's speech interest. Specifically, the Seventh Circuit considered the content of the speech, with speech that is "less serious, portentous, political, significant" imposing less of a burden on the government's justification, and the nature of the employee's responsibilities, with employers having more leeway with employees whose positions require contact with the public. *Id.* at 1119. The Seventh Circuit also concluded that the school district reasonably predicted that this book would interfere with the school's learning environment, particularly given the plaintiff's role as a guidance counselor and whether female students would be comfortable seeking his advice "given his professed inability to refrain from sexualizing females" and his views that "women are not inclined to rational thought[.]" *Id.* at 1120. As such inferences were reasonable, the school district's interest in ensuring effective delivery of counseling services to female students "dwarfed" the minimal weight given to plaintiff's speech, as it was "not the sort of topic of expression that Defendants would require a compelling reason to restrict." *Id.*

Considering the actual, or reasonably inferred, impact on the student population and school community is a common part of conducting *Pickering* balancing when the plaintiff is an employee of a school district. In *Hedgepeth v. Britton*, the plaintiff, a public-school teacher, was terminated after making three Facebook posts on June 1, 2020, amidst the unrest following the death of George Floyd. 2024 WL 689959, *2 (N.D. Ill. Feb. 20, 2024). These posts included, in response to news

about incidents of rioting and looting, photos from the plaintiff's vacation with the caption, "I don't want to go home tomorrow. Now that the civil war has begun I want to move." When a friend responded on her post, plaintiff replied, "I need a gun and training." *Id.* Next, the plaintiff reposted a meme that said "Wanna stop the Riots? Mobilize the septic tank trucks, put a pressure cannon on em ... hose em down ... the end." She added, "You think this would work?" *Id.* Lastly, in an exchange with a former student, the plaintiff responded, "I find the term 'white privilege' as racist as the 'N' word." *Id.*

By the next day, the school principal and the district received messages, calls, emails, and media inquiries about the posts. The school district issued a press statement distancing itself from the posts and apologizing for any harm caused by them. *Id.* The district court found that, even though plaintiff's comments involved a politically salient issue, her speech should not be afforded special weight as it did not reflect knowledge gained through her public employment nor was she offering novel commentary to a fraught political moment. *Id.* at \*8. Therefore, even though she made these comments outside of work—which is generally seen as less disruptive to the efficient function of the school—she had friended former students on Facebook and admitted that her posts had the ability to reach a wide audience including those in her school district. *Id.* Moreover, the defendants presented ample evidence of the actual disruption caused by the posts, including that the district had receive 113 emails about the posts, including many examples of students and parents expressing concern about plaintiff's fitness as a teacher, and 44 public comments submitted to the June board meeting expressing criticism of her. *Id.* at \*9. As such, it was clear that the district "was forced to divert resources from the normal operations of school services to address [plaintiff's] posts." *Id.* Further, although the school was not required to show actual interference with the plaintiff's ability to perform her job duties, the concerns expressed by community

12

members about her ability to be unbiased in her role as a teacher and build trusting relationships with students, given the substantial minority population in the school, provided a reasonable basis for the defendants to conclude she could not perform the role. *Id.* at *10. Therefore, the district court found that undisputed facts showed the plaintiff's post caused a significant disruption to the school's operations, and thus the district's interests outweighed the plaintiff's and there was no First Amendment violation by dismissing her. *Id.* at *11.

While courts occasionally receive detailed factual records like the one presented in *Hedgepeth*, other times when faced with a summary judgment motion, the record fails to contain sufficient evidence for the court to find the *Pickering* test satisfied as a matter of law. One such example is *Coen v. Coffelt*, 2011 WL 1303340, at *7 (N.D. Ill. Mar. 31, 2011). In *Coen*, the plaintiff, an employee at the Lake County Clerk's Office, vocally supported the incumbent clerk's political opponent in the November 2008 election for clerk. *Id.* at *1. It was also undisputed that the incumbent clerk had been informed about the plaintiff's negative remarks about her and plaintiff's support for the opposition candidate while working. *Id.* at *7. However, the plaintiff argued that her comments did not disrupt the office, which she supported with testimony of two coworkers who stated she had a positive attitude and had not observed her make negative comments. *Id.* at *8. This argument was further bolstered by the defendant's vague recollection of what she had been told about the plaintiff and by whom. *Id.* This left a disputed fact about "whether plaintiff's actions adversely impacted the atmosphere in the clerk's office." *Id.* The district court next considered that plaintiff's role was overwhelmingly clerical and did not require personal loyalty or the ability to keep confidences. *Id.* The court also noted that the plaintiff received "meeting expectation" performance reviews until she was terminated, and while there were comments about how she could improve her attitude, she was never disciplined for these or

13

any other alleged performance issues until she was terminated. *Id.* But, when considering the time, place, manner, and context of the speech, it was undisputed that plaintiff made the comment while working at the clerk's office to customers and her coworkers in the weeks leading up to the election. *Id.* Therefore, when weighing these factors, the district court found that there were genuine issues of material fact regarding whether the defendant's interest in promoting efficiency at the clerk's office outweighed the plaintiff's interest in her political speech. *Id.* at *9.

With that background on the application of the *Pickering* balancing test, the Court turns to the issue raised in this case. Defendant argues that Plaintiff's Facebook advertisement for a gun raffle, posted in May 2022,[4] which included a photo of the gun, caused significant disruption to the district's educational environment. Doc. [56] at 7–8. Defendant notes that on May 24, 2022, there was a massacre of nineteen children and two adults at an elementary school in Uvalde, Texas, which had a student population similar to that of the District. According to Defendant, the timing of the advertisement in relation to the Uvalde school shooting was discussed by District employees as an example of poor judgment and insensitivity by Plaintiff. Doc. [56] at 7.

The arguments raised by Defendant touch on two of the *Pickering* factors: whether the speech would create problems in maintaining discipline or harmony among co-workers and whether the speech impeded the employee's ability to perform her responsibilities. *Harnishfeger*, 943 F.3d at 1115. Defendant's main argument is that because of the Uvalde school shooting, Plaintiff's advertisement caused a "significant disruption" to the District's educational environment, as it upset and caused anxiety among staff and parents. Doc. [56] at 7; Doc. [61] at 7. Defendant points to evidence that teachers texted about how the advertisement and the gun raffle showed an insensitivity by Plaintiff. Doc. [57] ¶ 51. In response, Plaintiff argues that there

---

[4] The date the advertisement was originally posted is not in the record.

is no connection between the shooting in Uvalde and her campaign advertisement, and that any argument to the contrary is pure speculation. Doc. [59-1] at 6-7.

A public employer has a strong interest in avoiding interference "with work, personnel relationships, or the speaker's job performance" that "can detract from the public employer's function[.]" *Rankin v. McPherson*, 483 U.S. 378, 388 (1987). "The disruption need not come to pass in order for the employer to take action;" instead the Seventh Circuit gives "substantial weight to government employers' reasonable predictions of disruption." *Craig*, 736 F.3d at 1119 (quoting *Crue v. Aiken*, 370 F.3d 668, 685 (7th Cir. 2004)). "But an employer's assessment of the possible interference caused by the speech must be reasonable" and not "mere speculation." *Id.* As discussed above, courts "must also consider the nature of the employee's responsibilities" as an "employer may have more leeway in restricting the speech of an employee whose position requires contact with the public." *Id.* Further, courts give special consideration in the school-employees context, given the level of trust and authority vested in those roles. *Id.*; *Hedgepeth*, 2024 WL 689959, at *7.

Here, unlike cases like *Harnishfeger*, where the plaintiff was merely doing clerical work, and where courts have found they could not reasonably be speaking on behalf of their public employer, Plaintiff was the Executive Director of Student Services. 943 F.3d at 1117; Doc. [57] ¶ 1. It is reasonable to conclude that her level of authority, particularly given the school environment, weighs in favor of Defendant being granted leeway to restrict her speech. However, this leeway is not absolute, and Defendant's inferences must still be reasonable. This is not clear from the record. Although, it is undisputed that the East Aurora School District student population was very similar to that of the Uvalde school, and that there was concern that promoting a gun raffle could stir up anxiety in parents, there is no evidence that it actually did. Doc. [57] ¶¶ 48, 49.

15

While Defendant points to concern (by unnamed individuals at the District) that Plaintiff's advertisement "could stir up anxiety in parents[,]" Defendant failed to provide any evidence that it did or that the District received comments from parents to that effect. Further, Plaintiff was running for Regional Superintendent of Schools for Will County, Illinois. Doc. [57] ¶ 40. But at the time she was the Executive Director of Student Services for the Board of Education of the East Aurora School District 131, a different school district located in Kane County, Illinois. Doc. [57] ¶ 1. So, without any evidence in the record that parents from East Aurora saw the advertisement, the Court cannot assume that those parents saw and were concerned by a political advertisement for a campaign in a different county, when there is no evidence that Plaintiff connected her speech to her employment with Defendant.

This is unlike *Craig*, where the Seventh Circuit found defendants reasonably inferred that the plaintiff's book would become common knowledge and interfere with the school's learning environment, because plaintiff thanked his students in the book's acknowledgments, showing that he anticipated they would read it and the superintendent cited concerns from the community about the book in the letter to plaintiff. 736 F.3d at 1120. Similarly, this is far from the immediate and significant response the school district received in *Hedgepeth*, where there were multiple news outlets covering the comments and the district received 113 emails about the teacher's posts. 2024 WL 689959, at *9. There, the school district had ample evidence of complaints and concerns from parents and the community as evidence of the actual disruption caused by the plaintiff's Facebook posts. *Id.* at *8–9. Also, the defendants in *Hedgepeth* had evidence that the plaintiff was friends with and interacted with former students on Facebook, and as such, that members of their school community saw her posts. *Id.* at *8. In this case, Defendant has not identified any evidence of parents' knowledge of plaintiff's campaign advertisement, let alone that they were concerned by

it. Given the lack of this evidence, Defendant cannot demonstrate, for purposes of obtaining summary judgment, that Plaintiff's speech prevented Defendant from maintaining harmony or that it prevented Plaintiff from doing any of the public facing parts of her job.

Next, Defendant asserts that Plaintiff's gun raffle was considered offensive by administrators and staff. Doc. [57] ¶ 50. Plaintiff does not dispute this, but Defendant does not identify these administrators and staff or whether they worked with Plaintiff. Like in *Coen*, where the defendant could not recall who told her about the plaintiff's negative comments, the Court can only give limited weight to statements where the speaker does not know who the information came from. 2011 WL 1303340, at *8. Further, beyond affidavits claiming that unnamed "administrators and staff" were offended, Defendant provides a single group chat of teachers disapproving of her advertisement, but does not identify these teachers and if any of them worked with Plaintiff. This is unlike the facts in *Craig*, where the school had reasonable doubts about whether female students, who had to interact with plaintiff as their guidance counselor, could get effective counseling from the plaintiff after his book professed his "inability to refrain from sexualizing females." 736 F.3d at 1120. Although Plaintiff was informed that the advertisement and gun raffle exhibited "poor judgment" (and she agreed that the timing was bad in light of the shooting in Uvalde), there is insufficient evidence to determine, on summary judgment, that she was unable to perform her job in the same sense as a high school guidance counselor who published a book explaining his beliefs that "women are not inclined to rational thought" and "the importance of a woman's sexual 'submissiveness' to her male partner." *Id.*; Doc. [57] ¶¶ 64, 65; Doc. [59-2] ¶¶ 64, 65. Defendant does not identify evidence of students, parents, or staff that were unwilling to continue working with Plaintiff because of this advertisement.

17

Turning to the time, place, and manner of the speech, Plaintiff's campaign advertisement was on her private Facebook page and there is no allegation that she made the post or discussed it while at her job with Defendant. Unlike the plaintiff in *Coen*, who was supporting her boss's political opponent in an upcoming election while at work, Plaintiff was not making political comments to her coworkers or parents while working for the District. 2011 WL 1303340, at *8. Instead, similar to the plaintiff in *Harnishfeger*, Plaintiff's speech was on her private Facebook page and done outside of the confines of her work. 943 F.3d at 1118. Further, it is unclear when in May 2022 Plaintiff first posted her campaign advertisement, and whether it was before or after the shooting in Uvalde that occurred on May 24, 2022. Defendant only states that the assistant superintendent was shown the advertisement in late May, but does not provide an exact date or describe the circumstances between when the assistant superintendent was notified in late May and when Plaintiff was placed on leave on June 7. Doc. [57] ¶ 47. This lack of information about the timing of these events does not weigh in Defendant's favor.

Further, the delay between when the advertisement was posted and when Plaintiff was placed on leave calls into question whether Defendant's inferences about a potential disturbance were reasonable. As the Seventh Circuit discussed in *McGreal*, if during the delay between the plaintiff's speech and the defendant's action, the defendant's inferred negative consequences do not come to fruition, "it naturally becomes more difficult for an employer to satisfy its burden of proving that punishment on the basis of anticipated disruption was reasonable." 368 F.3d at 681. In *McGreal*, the Seventh Circuit considered that the defendants proffered no evidence of the plaintiff's speech causing an actual disturbance to police operations, despite delaying seven-months from the plaintiff's last instance of speech before suspending him. *Id.* Although not to the same extent as the seven-month delay in *McGreal*, the lack of evidence of any actual disruption to

Plaintiff's ability to do her job between when she posted the advertisement and when she was placed on leave does not permit a clear conclusion about whether Defendant's stated concerns were reasonable. This is particularly true, when compared to the drastic and immediate reaction the school district received to the plaintiff's Facebook posts in *Hedgepeth*, where the school principal began receiving messages about the posts the next day. 2024 WL 689959, at *2. Further, unlike in *Hedgepeth*, there is no evidence that Defendant had to divert district resources to address community concerns related to Plaintiff's advertisement. *Id.* at *9. Here, there is no evidence in the record of any parents or community members contacting the school to express their concerns about Plaintiff's advertisement. Thus, whether Defendant's concerns of disruption were reasonable is an open question and makes this case inappropriate for summary judgment.

Lastly, the Court considers the context in which the speech arose. *Harnishfeger*, 943 F.3d at 1115. While Defendant argues that the image of a gun next to Plaintiff's face on the advertisement and advertising a gun raffle was cause for concern given the Uvalde school shooting, such an argument takes Plaintiff's advertisement far outside its intended context. The speech at issue was a campaign advertisement for a fundraiser for Plaintiff's political campaign. Nowhere on the advertisement does it reference guns in schools, arming teachers, school shootings, or the shooting in Uvalde. The gun pictured on the advertisement was a prize at a raffle Plaintiff was hosting to raise funds for her political campaign. This is unlike the Facebook posts and comments made by the plaintiff in *Hedgepeth*, which were about and in direct response to the unrest following George Floyd's death. 2024 WL 689959, at *8. Here, Plaintiff was not commenting or responding to the school shooting in Uvalde, or any school shooting, but instead she was raising funds to run for office. Thus, the context of Plaintiff's speech weighs against a finding for the Defendant's interest.

Given the disputed facts about whether Plaintiff's speech adversely impacted the atmosphere at the District or her ability to perform her role, and the mixed results of the other factors, this case is most similar to *Coen*. 2011 WL 1303340, at *8–9. In *Coen*, after finding that there were disputed material facts regarding whether the plaintiff's political speech adversely affected the atmosphere of the clerk's office, but that nothing suggested plaintiff's speech impeded her ability to perform her role and that her duties were merely clerical, the court denied summary judgment because there were genuine issues of material fact about whether defendant's interest in promoting efficiency outweighed the plaintiff's interest in her political speech. Similarly, the facts do not provide for a clear outcome here. While Plaintiff was in a public facing role with authority and that required trust, the neutral context of her speech as part of her political campaign and that it was made outside of her role for the District, weigh in favor of Plaintiff's speech interests. Further, the record does not indicate the timing of any of the important events which would allow for the inferences Defendant seeks to make about how to evaluate the impact of the Uvalde shooting. It is also disputed how much of a disruption Plaintiff's speech actually caused, or could be reasonably inferred to have caused, to the harmony among coworkers and Plaintiff's ability to perform her job responsibilities.

The burden is on Defendant to establish the elements of a *Pickering* balance defense and to show why the evidence is "so one-sided as to rule out the prospect of a finding in favor" of Plaintiff. *Harnishfeger*, 943 F.3d at 1116 (quoting *Hotel*, 778 F.3d at 601). Given the absence of evidence in the record and disputed facts, Defendant has not met this burden and summary judgment cannot be granted. "While it is true that in some cases the undisputed facts on summary judgment permit the resolution of a claim without a trial, that means only that the *Pickering* elements are assessed in light of a record free from material factual disputes." *McGreal*, 368 F.3d

20

at 677 (quoting *Gustafson*, 290 F.3d at 909). Assessing "*Pickering* balancing is not an exercise in judicial speculation." *Id.* (quoting *Gustafson*, 290 F.3d at 909). Unlike the cases where courts easily found for the public employer or the employee, the record here does not present a straightforward call. Thus, summary judgment is denied as to Count III.

### c. Plaintiff's Deprivation and Defendant's Motivating Factor

As to the remaining two elements of a First Amendment retaliation claim—whether plaintiff suffered a deprivation likely to deter protected speech and whether the protected speech was a motivating factor in Defendant's decision—the focus of the arguments is on whether Defendant placed Plaintiff on leave and did not renew her contract because of her performance. Whether Plaintiff was a poor performer and whether this was disclosed to her is hotly contested.

Defendant asserts that Plaintiff was informed during an October 25, 2021, meeting about issues with her attendance, her failure to follow the chain of command, and communication concerns with her department and her supervisor. Doc. [62] ¶ 7; Doc. [57-4] ¶ 20; Doc. [57-5] ¶¶19–20. However, at her deposition, Plaintiff testified that during the October 25, 2021 meeting, they discussed how she was unaware that the meeting she was going to miss was mandatory as the invite she received said "optional", that no one told her prior to the meeting that it was mandatory, and that she turned her car around after leaving the school to attend the meeting, so she was not absent. Doc. [57-3] 201:17–207:21.

Defendant points to other instances where they argue Plaintiff was involved in overseeing staff hours and was using sick time in violation of District policy, but in her testimony, Plaintiff disputes that characterization and explains the issues she had with staff hours and her illness. Doc. [62] ¶ 9; Doc. [57-4] ¶ 8; Doc. [57-5] ¶ 18; Doc. [57-6] ¶¶ 6, 8; Doc. [57-3] at 197:13–201:16. Plaintiff further testified that these performance concerns were not raised with her in October 2021.

21

Doc. [57-3] at 213:19–24. There is also a dispute regarding whether she missed meetings – Plaintiff testified that she did not miss meetings and could not recall any meetings that she missed, but Defendant points to affidavits from administrators to support their claim that she missed meetings. Doc. [57-3] at 192:19–193:19; Doc. [62] ¶ 9.

In support of her argument that Defendant acted because of her protected speech, Plaintiff testified that she never received written or verbal warnings about performance issues at her job. Doc. [57-3] at 249:7–250:7. Also, Dan Charmelo, a Coordinate I in the Human Resources Department for the District, testified that Plaintiff's contract was not renewed because of the gun raffle. Doc. [57-7] at 57:17–22. He further testified that prior to the gun raffle advertisement, Plaintiff "was the golden child" who was "doing everything good for the district" and afterwards "all of a sudden, she was the enemy[.]" Doc. [57-7] at 60:16–23. He was also not aware of a verbal or written warning about her job performance, despite being the HR person who would have been aware of it. Doc. [57-7] at 60:24–61:8. Thus, there is a genuine dispute of material fact regarding whether Plaintiff had any job performance issues to substantiate Defendant's claim that her placement on administrative leave and the decision not to renew her contract were based on poor job performance and not as retaliation for her speech. This provides another basis for the denial of summary judgment on Count III.

## II. Count I – 2021 Contract Breach

Turning to Count I of the Amended Complaint, Plaintiff alleges that Defendant is in breach of her 2021 employment contract because she was wrongfully terminated without notice as a result of her campaign advertisement. "Under Illinois law, to prevail on a breach of contract claim the plaintiff must show: (1) the existence of a valid and enforceable contract, (2) she substantially

22

performed the contract, (3) the defendant breached that contract, and (4) damages resulted from the alleged breach of contract." *Swyear v. Fare Foods Corp.*, 911 F.3d 874, 886 (7th Cir. 2018).

It is undisputed that Plaintiff had a one-year employment contract with the Board, running from July 1, 2021, to June 30, 2022. This contract did not have an automatic right of extension or renewal. It is also undisputed that Plaintiff was placed on paid administrative leave on June 7, 2022, and she received her full salary and benefits but was not required to engage in work for the District until the end of her contract term. Doc. [57] ¶¶ 72, 74; Doc. [59-2] ¶¶ 72, 74. Although Plaintiff phrases this as termination in her complaint and occasionally in her testimony, she also agreed that she was placed on administrative leave and paid her full benefits. Doc. [12] ¶¶ 20–21; Doc. [57] ¶ 72; Doc. [57-3] at 25:19, 54:11–20, 232:14, 263:5; Doc. [59-1] at 2–5; Doc. [59-2] ¶ 72; Doc. [62] ¶¶ 2–3. As such, there is no dispute that Plaintiff was placed on administrative leave, and not terminated, on June 7, 2022.

Plaintiff does not argue that merely placing her on administrative leave was a breach of her contract. Doc. [59-1] at 3–4. Instead, Plaintiff claims that the breach of the 2021 contract occurred as a result of Defendant's failure to renew her contract for 2022. It is undisputed that her 2021 contract did not have an automatic right of renewal, which dooms her claim. Doc. [12-2]. But Plaintiff asserts that she should have been given notice based on the "Board of Education Policy, 3:50 Administrative Personnel Other than the Superintendent", that required the superintendent to present recommendations regarding administrators' compensation no later than the March board meeting. However, this argument fails based on the plain language of the policy, which states in relevant part:

Duties and Authority

The School Board establishes District administrative and supervisory positions in accordance with the District's needs and State law. This policy applies to all

administrators other than the Superintendent, including without limitation, Building Principals. The general duties and authority of each administrative or supervisory position are approved by the Board, upon the Superintendent's recommendation, and contained in the respective positions job description. In the event of a conflict, State law and/or the administrator's employment agreement shall control.

<u>Compensation and Benefits</u>

The Board and each administrator shall enter into an employment agreement that complies with Board policy and State law. The terms of an individual contract when in conflict with this policy, will control.

The Board will consider the Superintendent's recommendations when setting compensation for individual administrators. These recommendations should be presented to the Board no later than the March Board meeting or at such earlier time that will allow the Board to consider contract renewal or nonrenewal issues.

Doc. [57-5] at 13. Plaintiff argues that because she was not given notice of her nonrenewal prior to the March Board meeting, Defendant is in breach because they violated the Board's own policies. Doc. [59-1] at 3. However, the plain language of this policy does not give Plaintiff, or any administrator, the right to notice of their renewal or nonrenewal prior to the Board's March meeting. The text merely provides that the Superintendent will give the Board compensation recommendations prior to its March meeting. There is no basis on which a reasonable jury could conclude that this policy granted Plaintiff a right to notice of her nonrenewal by March 2022. So, while it is undisputed that Plaintiff was not notified of her nonrenewal prior to the March 2022 Board meeting, that lack of notice is not evidence that Defendant's breached Plaintiff's 2021 Contract. Therefore, based on undisputed facts, there is no evidence that Defendant breach Plaintiff's 2021 Contract and Defendant is granted summary judgment on Count I.

Defendant argues that even if there was a breach of contract, Plaintiff suffered no damages because she was paid her full salary and benefits under her 2021 contract. Doc. [56] at 13–14. Plaintiff does not respond to this argument in her opposition, as such any opposition to this argument is waived. Doc. [59-1]; *Ennin v. CNH Indus. Am., LLC*, 878 F.3d 590, 595 (7th Cir. 2017) ("Failure to respond to an argument generally results in waiver[.]"); *Gross v. Town of Cicero, Ill.*,

619 F.3d 697, 704 (7th Cir. 2010) ("[I]t is not this court's responsibility to research and construct the parties' arguments, and conclusory analysis will be construed as waiver.") (quoting *APS Sports Collectibles, Inc. v. Sports Time, Inc.*, 299 F.3d 624, 631 (7th Cir. 2002)); *Hicks v. Midwest Transit, Inc.*, 500 F.3d 647, 653–54 (7th Cir. 2007) (Plaintiff "had the burden to point to ... information to show that a genuine issue of fact exist[s]; the district court need not scour the record to find such evidence.") (internal quotations omitted); *De v. City of Chicago*, 912 F. Supp. 2d 709, 733 (N.D. Ill. 2012) ("[T]he opposing party waives any argument that it does not present and develop in its memorandum of law in opposition to summary judgment."). Therefore, even if Defendant theoretically breached the employment contract, Plaintiff has not identified any disputed facts to establish that she suffered an injury as a result of the breach. This provides an alternative basis to grant summary judgment for Defendant.

### III. Count II – 2022 Contract Breach

Plaintiff also alleges that Defendant breached her 2022 Contract. Whether Plaintiff was ever offered this contract, and whether the contract existed at all, is contested. Plaintiff testified that on June 1, 2022, Dan Charmelo dropped off the 2022 Contract at her office and told her to sign it. Doc. [57-3] at 45:15–47:7. Plaintiff said Charmelo told her she could not make a copy of it, but allowed her 20 minutes to read and sign the contract. *Id.* at 47:8–24. Plaintiff signed and returned the contract to Charmelo without making a copy. *Id.* at 48:2–11. Charmelo, however, testified that he did not create or give her a 2022 Contract. Doc. [57-7] 55:4–56:15. Defendant also points to multiple affidavits from administrators at East Aurora School District 131—Dr. Jennifer Norrell (Superintendent), Amanda Sanderson (Executive Director of Human Resources), and Jalitza Martinez (Associate Superintendent of School Leadership)—stating that Plaintiff was never offered a 2022 Contract and that no such contract was ever created. Doc. [57-4] ¶ 48; Doc.

[57-5] ¶ 14; Doc. [57-6] ¶¶ 44–45. Defendant also asserts that even if Charmelo provided Plaintiff the 2022 contract, he had no authority to do so, because the administrator contracts were being drafted by other employees. Doc. [57-6] ¶ 45; Doc. [57-7] 41:17–42:7.

But these disputes of fact are not material. Even under Plaintiff's version of events, where she signed and returned the 2022 Contract, this is insufficient to establish that a contract existed. A basic principle of contract law is that the parties must mutually assent to the terms. "Generally speaking, a signature is a manifestation of assent to a contract, though a court may still enforce a contract in the absence of a signature if there are other indications of assent." *Romano v. First Midwest Bancorp, Inc.*, 2024 WL 1363669, at *5 (N.D. Ill. Mar. 30, 2024). The 2021 contract, which Plaintiff alleges was substantially the same as the 2022 contract, states "IN WITNESS WHEREOF, the parties have caused this Agreement to be executed in their respective names, and in the case of the Board, by its President…" above the signature line. Doc. [12-2]. "Where parties reduce the agreement to writing and its signature by them is a condition precedent to its completion, no contract will exist until that is done." *In re Est. of Adames*, 2020 IL App (1st) 190573, ¶ 48, 178 N.E.3d 235, 246. Therefore, the 2022 contract required the President to sign Plaintiff's contract on behalf of the Board as a condition precedent to completing the contract.

Plaintiff testified that the Board had to countersign the agreement after she signed it, and that the Board did not sign her renewal. Doc. [57-3] at 60:1–10. So, with this undisputed fact, there was no contract between the parties. Without a valid and enforceable contract, there is no contract for Defendant to have breached. Thus, Plaintiff cannot establish the first element of a breach of contract claim—the existence of a valid and enforceable contract—and Defendant is granted summary judgment on Count II.

## Conclusion

For the reasons stated above, Defendant's Motion for Summary Judgment is granted in part and denied in part, Doc. [55]. Defendant is granted summary judgment as to Counts I and II, but summary judgment is denied as to Count III.

**SO ORDERED.**

Dated:  April 16, 2025

_____
Sunil R. Harjani
United States District Judge